**In the Matter of Barry Stuart UDELL, Debtor–Appellee.**

**Appeal of the STANDARD CARPETLAND USA, INC., Appellant.**

**No. 93–2002.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1993.

Decided March 3, 1994.

Howard B. Sandler, Robert L. Nicholson (argued), Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, IN, for appellant.

Mark A. Warsco (argued), Patricia J. Pikel, Warsco & Brogan, Fort Wayne, IN, for debtor-appellee.

Before FLAUM and EASTERBROOK, Circuit Judges, and SKINNER, District Judge.*

SKINNER, District Judge.

A bankruptcy court granted the creditor-appellant relief from the automatic stay prescribed by the Bankruptcy Code, finding that its right to an injunction to enforce a restrictive covenant was not a "claim" dischargeable in bankruptcy. The district court reversed,

* Hon. Walter Jay Skinner of the District of Massa-     chusetts, sitting by designation.

and this appeal followed. We reverse and remand.

The Standard Carpetland USA, Inc. ("Carpetland") employed debtor-appellee Barry Stuart Udell ("Udell") in its Fort Wayne, Indiana store. The parties entered an employment contract that included a covenant not to compete. For three years after leaving Carpetland, Udell was not to engage in any business similar to Carpetland within 50 miles of Fort Wayne. The covenant gave Carpetland the right to both an injunction and liquidated damages:

> In the event of Udell's actual or threatened breach of the provisions of this paragraph 11, Carpetland shall be entitled to an injunction restraining Udell as well as reimbursement for reasonably [sic] attorneys fees incurred in securing said judgment and stipulated damages in the sum of $25,000.00.

Soon after leaving Carpetland, Udell purchased a local carpet store which he claims does not compete in the same market as Carpetland. Udell sued Carpetland in the Superior Court for Allen County, Indiana, seeking damages for breach of the employment contract with respect to allegedly past due commissions and other compensation. Carpetland counterclaimed for damages and an injunction pursuant to the restrictive covenant. The state court granted Carpetland a preliminary injunction in June, 1992. Udell is appealing this order in the Indiana appellate courts.

Several days after the injunction issued, Udell filed a Chapter 13 bankruptcy petition. To enforce its preliminary injunction in the Indiana court, Carpetland filed a motion for emergency relief from the automatic stay prescribed by the Bankruptcy Code. Carpetland argued that its right to an injunction was not a "claim" under § 101(5)(B) of the Bankruptcy Code, 11 U.S.C. § 101 et seq., and therefore could not be discharged in Udell's bankruptcy. In relevant part, § 101(5)(B) defines "claim" as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment."

## PROCEEDINGS IN THE LOWER COURTS

The bankruptcy court granted Carpetland relief for the purpose of enforcing the injunction entered in the state court. 149 B.R. 898 (Bkrtcy.N.D.Ind.1992). The court ruled that Carpetland's right to injunctive relief was not a claim dischargeable in bankruptcy. Under Indiana law, an injunction may issue only if the remedy of damages is inadequate. The state court had ruled in this case that an injunction is the proper remedy for Udell's breach, and under the strictures of Indiana law, this ruling necessarily encompasses a decision that the right to the injunction could not be satisfied by the payment of liquidated damages. Accordingly the breach that gives rise to the injunction does not "give rise to a right to payment" under § 101(5)(B). The bankruptcy court further ruled that relief from the automatic stay was warranted because "the potential harm to Carpetland by continuing the stay outweighs the potential harm to [Udell] which may flow from terminating it." Id. at 907.

The district court reversed the grant of relief. 149 B.R. 908 (N.D.Ind.1993). It held that Carpetland's right to an injunction is a § 101(5)(B) "claim" dischargeable in bankruptcy because it also enables Carpetland to seek liquidated damages. Carpetland's restrictive covenant provides for an injunction and liquidated damages in the event of "threatened" as well as actual breaches. In the opinion of the district judge, a "threatened" breach is a future breach. Because a future breach gives rise here to liquidated damages, "the usual reason for granting ... injunctions, which is, that money damages for ... future violations are inadequate because of the inability to prove the extent of damages resulting from future breach of the restrictive employment covenants, does not apply." Id. at 912. The district court acknowledged that Indiana law requires a showing of "irreparable harm incapable of reduction to monetary relief" before an injunction may issue. The court concluded, however, that "it is solely because the specific language employed by these parties contemplates liquidated damages for future

breach that the right to payment arises in this case." *Id.* at 912 n. 7.

In reversing the bankruptcy court's grant of relief from the stay, the district court found it unnecessary to reach Udell's argument that, even if Carpetland's right to an injunction were not a § 101(5)(B) claim, the bankruptcy court abused its discretion by giving insufficient consideration to Udell's inability to get a "fresh start," or to the unequal treatment of other creditors which will result from the lifting of the stay.

## WAIVER

■ Udell asserts that Carpetland has waived its arguments before us because only one of its arguments was raised in its petition for reconsideration in the district court. We are satisfied, however, that at one time or another, the substance of all of Carpetland's present arguments were subsumed in the presentation to the district court.

## DISCUSSION

■ For bankruptcy purposes, a "debt" is a liability on a "claim." 11 U.S.C. § 101(12). By fashioning a single definition of "claim" for the 1978 Bankruptcy Code, Congress intended to adopt the broadest available definition of that term. *Pennsylvania Public Welfare Dep't v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990); *Johnson v. Home State Bank,* 501 U.S. 78, ——, 111 S.Ct. 2150, 2154–55, 115 L.Ed.2d 66 (1991). Under § 101(5) of the Code, a " 'claim' means"—

(A) right to payment ... or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

Carpetland argues that our interpretation of § 101(5)(B) should focus on whether the equitable remedy itself gives rise to an alternative right to payment. Udell, on the other hand, argues that a right to an equitable remedy is a "claim" whenever the breach of performance also gives rise to a right to

payment—*any* right to payment, even one that serves a separate remedial purpose from the equitable remedy. We must decide whether § 101(5)(B) requires any connection between the equitable and the legal remedies beyond the fact that both remedies arise from the same breach of performance.

In *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Supreme Court provided some general guidelines for the interpretation of § 101(5)(B). The State of Ohio had obtained a state court judgment against Kovacs for violations of environmental laws at a hazardous waste disposal site. The judgment included (1) an injunction to stop further pollution of the site, the air and public waters; (2) an injunction to clean up the site ("cleanup order"); and (3) an order to pay Ohio $75,000 for injury to wildlife. When Kovacs failed to comply with the judgment, Ohio obtained the appointment of a receiver who took possession of Kovacs' property and began to clean up the site. Kovacs filed for bankruptcy before the receiver had completed his task. The question presented was whether the cleanup order was a "claim" under § 101(4)(B)—now § 101(5)(B)—of the Bankruptcy Code.

The Court found that Ohio had effectively converted its cleanup order into a demand for money damages. After the appointment of the receiver, the only performance Ohio sought from Kovacs was "a money payment to effectuate the ... clean up." *Id.* at 282, 105 S.Ct. at 709 (quoting from the Sixth Circuit's opinion below, *In re Kovacs,* 717 F.2d 984, 987 (1983). Because the cleanup order had given rise to a right to payment, the order was a "claim" dischargeable in bankruptcy. The Court emphasized what it had not decided: whether the injunction against further pollution was also a "claim" under § 101(5)(B). *Id.* at 284, 105 S.Ct. at 710.

*Kovacs* is helpful in its analysis of the statute, even though the resolution of that case turned on the fact that Ohio had itself elected to convert its equitable right into a demand for a money judgment, the reverse of our present situation. The Court noted that "the key phrases 'equitable remedy,' 'breach of performance,' and 'right to pay-

ment' are not defined" in § 101(5)(B); it proceeded to examine its legislative history. *Id.* at 280, 105 S.Ct. at 708. We conclude that the Court deemed these provisions ambiguous and follow the Court's example by examining the legislative history of § 101(5)(B), "sparse as it is." *Id.* at 280, 105 S.Ct. at 708. *Cf. United States v. Ron Pair Enterprises,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

A sponsor of the Bankruptcy Reform Act stated with respect to the definition of "claim":

> Section 101(4)(B) [now § 101(5)(B) ] ... is intended to cause the liquidation or estimation of contingent rights of payment for which there may be an *alternative* equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy. For example, in some States, a judgment for specific performance may be satisfied by an alternative right to payment, in the event performance is refused; in that event, the creditor entitled to specific performance would have a "claim" for purposes of a proceeding under title II.
>
> On the other hand, rights to an equitable remedy for a breach of performance *with respect to which* such breach does not give rise to a right to payment are not "claims" and would therefore not be susceptible to discharge in bankruptcy.

124 Cong.Rec. 32393 (1978) (remarks of Rep. Edwards) (emphasis added). The quoted part of the legislative history shows that one example of a "claim" is a right to an equitable remedy that can be satisfied by an "alternative" right to payment. If the right to payment is not an alternative remedy, it must at least arise "with respect to" the equitable remedy, not apart from it. *Id.* The proper inquiry under § 101(5)(B), then, is whether Carpetland's right to an injunc-

tion "gives rise" to an alternative or other corollary right to payment of liquidated damages.

Udell argues that Carpetland has improperly shifted our inquiry from whether the "breach" gives rise to a right to payment, to whether the "equitable remedy" gives rise to a right to payment. This, Udell claims, is to rewrite the statute. We disagree. There must first be a breach that gives rise to a right to an equitable remedy. Under applicable federal or state laws, that remedy may give rise to an "alternative" or other corollary right to payment. Both remedies, however, issue from the original breach; "such breach" as gives rise to the equitable remedy also gives rise to the right to payment.[1]

This reading of § 101(5)(B) is reinforced by *Home State Bank,* 501 U.S. at ——, 111 S.Ct. at 2154, where the Court ruled that a creditor's right to foreclose on a mortgage is a "claim." Though the Court did not elaborate, in *Home State Bank* the equitable remedy of foreclosure necessarily gives rise to a right to payment—*i.e.,* the proceeds from the sale of the debtor's property.

Also consistent with our reading are the decisions, including our own, that deal with the dischargeability in bankruptcy of environmental injunctions. In *Matter of CMC Heartland Partners,* 966 F.2d 1143, 1146–47 (7th Cir.1992), we held that a CERCLA injunction directing a property owner to clean up his land created an obligation that "run[s] with the land" and survives bankruptcy. In *In re Chateaugay Corp.,* 944 F.2d 997 (2d Cir.1991), a case we cited in *CMC Heartland, supra,* the Court of Appeals for the Second Circuit distinguished between an injunction ordering the offender to remove accumulated wastes, and one ordering him to end further pollution from such wastes. The former "is a 'claim' if the creditor obtaining the order had the option, which CERCLA confers, to do

---

1. None of the courts that have interpreted § 101(5)(B) were troubled by any perceived conflict between the language of § 101(5)(B) and an inquiry, dictated by its legislative history, focusing on whether the equitable remedy gives rise to a right to payment. All of the courts below in *Kovacs* found that Ohio's cleanup order had given rise to a right to payment, rendering the order dischargeable in bankruptcy. The Supreme

Court approved the reasoning repeatedly affirmed below: the "cleanup duty had been reduced to a monetary obligation." *Id.* at 280, 105 S.Ct. at 708 ("the rulings of the courts below were wholly consistent with the statute and its legislative history"). *See also Matter of Davis,* 3 F.3d 113, 116–17 (5th Cir.1993) (examining equitable remedies to see if "alternate remedies of money damages exist").

the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation." The latter is not a "claim" because the creditor has "no option to accept payment in lieu of continued pollution"—*i.e.*, the injunction does not give rise to a right to payment. *Id.* at 1008. *See also In re Torwico Electronics, Inc.*, 8 F.3d 146 (3d Cir.1993) (citing *CMC Heartland* and *Chateaugay* with approval and holding that the state's cleanup order is not a "claim" because the state has no "right to payment under the statutory authority asserted or the Order imposed").

We recognize the appealing simplicity of Udell's "plain language" reading of § 101(5)(B). Udell asserts that "for an equitable remedy to be a claim, it must be the sole remedy available for breach of the agreement"; any right to payment arising from the same breach would turn the equitable remedy into a claim. The Supreme Court's approach in *Kovacs*, however, belies this reading of § 101(5)(B). In *Kovacs*, a single "breach of performance"—violations of environmental laws—had given rise to a judgment in three parts, two of them injunctive, and the third monetary. Udell's suggested "plain language" reading should have ended the case. Ohio already had a money judgment for injury to wildlife. This right to payment arose from the same breach as the cleanup order. For the Court, however, the cleanup order was a "claim," not because Ohio already had a $75,000 judgment arising from the same breach, but because Ohio's actions had effectively converted the cleanup order into money damages.

■ In light of *Kovacs, Home State Bank* and the legislative history of § 101(5)(B), we hold that a right to an equitable remedy for breach of performance is a "claim" if the same breach also gives rise to a right to a payment "with respect to" the equitable remedy.[2] If the right to payment is an "alternative" to the right to an equitable remedy, the necessary relationship clearly exists, for the two remedies would be substitutes for one

another. This is the example of "claim" given in the legislative history. As the Supreme Court's decision in *Home State Bank* implies, relationships other than outright substitution may also suffice. For example, the right to foreclose on a mortgage, though not strictly an "alternative" to the right to the proceeds from the sale of the debtor's property, nonetheless gives rise to a corollary right to payment (and may in fact be considered as an alternative to money in the sense that the debtor can stop the foreclosure by paying the full debt). The two remedies are sufficiently related that the Supreme Court classified the right to foreclose as a "claim." *See id.* 501 U.S. at ——, 111 S.Ct. at 2154.

## APPLICATION OF THE RULE TO THE PRESENT CASE

■ Indiana law determines the nature of Carpetland's contractual remedies, including whether the right to an injunction gives rise to a right to payment. *See Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (absent overriding federal interest, state law determines property rights in assets of bankrupt's estate); *Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 791 F.2d 524, 532 (7th Cir.1986).

■ With "the great weight of authority in this country," Indiana law permits (under proper circumstances) the award of an injunction in addition to liquidated damages. *Duckwall v. Rees*, 119 Ind.App. 474, 86 N.E.2d 460, 462 (1949) (en banc). The two remedies may be cumulative unless the liquidated damages were intended by the parties to be a substitute for performance:

> [W]here the sum specified [as liquidated damages] may be substituted for the performance of the act at the election of the person by whom the money is to be paid, or the act done, equity will deny specific performance and leave the aggrieved party to his remedy at law. Which of these types any given contract may be depends

---

2. This interpretation of § 101(5)(B) is also consistent with a complementary provision of the Bankruptcy Code. Section 502(c)(2) of the Code provides for the "estimat[ion] for purpose of allowance" of "any right to payment *arising from a right to an equitable remedy* for breach of performance" (emphasis added).

upon the intention of the parties as expressed in the whole instrument....

*Id.* While we have not found an Indiana case actually granting both remedies, the cases that deal with the subject in no way impeach this general statement. In *Duckwall,* where a contract for the purchase and sale of land provided for liquidated damages *and* repayment of the down payment in the event of the seller's breach, the court held that the right to payment was intended to be a substitute for specific performance, which would not be granted. In *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208 (Ind.App.1982), the court upheld an injunction enforcing a covenant not to compete but reversed an award of liquidated damages as an unforceable penalty because they were unrelated to actual damages. The court remanded the case for determination and award of any actual damages. *Id.* at 217. This opinion strongly supports the proposition that in Carpetland's case, an injunction and an award of liquidated damages are cumulative and not alternative. Udell cannot escape the restrictive covenant by paying $25,000 in liquidated damages.[3] *See also Hahn v. Drees, Perugini & Co.,* 581 N.E.2d 457, 463 (Ind. App.1991); *Rajski v. Tezich,* 514 N.E.2d 347, 348–49 (Ind.App.1987); 5A *Corbin on Contracts* § 1213 at 436 (1964) ("if there is a promise to render one particular performance, with a provision for payment of a sum of money as ... liquidated damages for breach, without anything more, the contract is not an alternative contract" giving the promisor the option between performance or payment); Restatement (Second) of Contracts § 361 (1981) ("[m]erely by providing for liquidated damages, the parties are not taken to have fixed a price to be paid for the privilege not to perform").[4]

■ The district judge found that a "threatened breach" is in effect a future breach, and that Carpetland's right to an injunction gives rise to a right to payment "solely because the specific language employed by these parties contemplates liquidated damages for *future* breach" (emphasis added). We disagree. A threatened breach is a present act. In Carpetland's case, a threatened breach could give rise to two independent remedies: (1) an injunction against the future realization of the threat, and (2) liquidated damages for the actual harm that has already accrued from the threat.[5] Carpetland's right to liquidated damages does not arise "with respect to" its right to an injunction, *see* 124 Cong.Rec. 32393; the two rights address entirely separate remedial concerns. *Cf. Davis,* 3 F.3d at 117 (trust remedy is "analogous to an injunction preventing Davis from committing future wrongs, which is an intangible command incapable of precise monetary estimation"). As *Kovacs* shows, the fact that both remedies are triggered by a single act does not mean that the right to an injunction gives rise to a right to liquidated damages.

We further find that Carpetland's right to an injunction does not give rise in any other sense to the payment of liquidated damages. Lacking is the derivative relationship between the two remedies exemplified by

---

**3.** The parties have not argued issue preclusion by reason of the order of the Allen County court, and accordingly we shall not enter that thicket. We do observe, however, that an Indiana judge, applying Indiana law, granted an injunction in this case, implying that the right to liquidated damages was cumulative and not alternative.

**4.** In *Hollars v. Randall,* 554 N.E.2d 1177 (Ind. App.1990), the buyer of real property sought specific performance plus damages for the seller's failure to close. The buyer invoked a clause of the purchase agreement providing that the seller shall pay buyer $50.00 per day for failure to deliver possession of the property after the date of closing. The trial court granted specific performance but denied damages under the clause. The Court of Appeals for the Second

District affirmed. In a footnote, the court stated that it is "technically incorrect" to characterize the $50.00 provision as "liquidated damages": "if the provision were truly for liquidated damages, the Hollars would have had an adequate remedy at law and would not have been entitled to specific performance." *Id.* at 1179 n. 1. We do not think that the court meant by this footnote to announce a rule contrary to *Duckwall, supra.* The court assumes that the parties would have intended that a "true" liquidated damages provision would replace the right to specific performance. If that were the case here, Carpetland's right to an injunction would undoubtedly be a "claim."

**5.** We express no view as to the enforceability of the liquidated damages provision.

*Home State Bank, supra,* where the equitable remedy of foreclosure was the means for realizing the right to the proceeds from the sale of the debtor's property. *Id.* 501 U.S. at ——, 111 S.Ct. at 2154.

Accordingly we rule that it was error for the district judge to reverse the order of the bankruptcy judge on the ground that the equitable relief sought by Carpetland was a "claim" dischargeable in bankruptcy.

## REMAND

It does not necessarily follow that Carpetland is entitled to relief from the stay, however. The automatic stay prescribed by the Bankruptcy Code applies to "judgment[s] obtained before the commencement of the case under this title," 11 U.S.C. § 362(a)(2), whether or not the judgment arises out of a "claim." Though the bankruptcy court correctly held that Carpetland's right to an injunction is not a claim, the court was required to also consider (1) the prejudice to the debtor or the bankruptcy estate from allowing the non-bankruptcy litigation to continue; (2) the relative hardship to the debtor and to the party seeking relief; and (3) the creditor's probability of prevailing on the merits in the litigation, before it could lift the automatic stay. *Matter of Fernstrom Storage and Van Co.,* 938 F.2d 731, 735 (7th Cir.1991). Udell argued before the district court that the bankruptcy court abused its discretion by not giving sufficient consideration to his inability to get a "fresh start," or to the unequal treatment of other creditors which will result from the lifting of the stay. The district court reversed the bankruptcy court on other grounds without considering this remaining issue. Because we reverse the district court's decision, we remand this case to the district court for a determination of whether the bankruptcy court abused its discretion by granting Carpetland relief from the automatic stay.

## DECISION

The order of the district court is *reversed,* and this case is *remanded* to the district court for consideration of whether the bankruptcy court abused its discretion by granting Carpetland relief from the stay. Costs to be awarded to Carpetland.

FLAUM, Circuit Judge, concurring in the result.

Even though I agree with the court's eventual outcome, I am unable to accept the court's approach which, in my view, dodges this statute's plain language in an effort to reach a sensible result.

This case presents a classic statutory construction problem. Mr. Udell entered into a contract with his employer Carpetland, Inc., promising not to compete against Carpetland within fifty miles for three years after leaving its employ. Subsequently Mr. Udell left Carpetland and breached this promise. The undisputed consequences of Udell's breach are spelled out in his employment contract—an injunction against Udell along with stipulated damages in the sum of $25,000. Carpetland sued obtaining the money plus an injunction. Udell declared bankruptcy asking that Carpetland's injunction be stayed under 11 U.S.C. § 362 (1990). Here, Udell tenders a theory that Carpetland's injunction is a "claim" dischargeable in bankruptcy as defined in 11 U.S.C. § 101(5)(B).

The statutory language defines a "claim" as a "right to an equitable remedy for breach of performance *if* such *breach* gives rise to a *right to payment,* ..." 11 U.S.C. § 101(5)(B) (emphasis supplied). Anyone unschooled in the intricacies of bankruptcy law might trustingly conclude that this is a fairly easy case—the injunction is a claim because the contract's breach gave rise to $25,000 damages, and therefore, Carpetland's injunction is subject to the automatic stay. The court, however, concludes that this cannot be. I agree, but most cautiously. Here we must do some pretty heavy lifting before we can disregard the genuinely plain text of this statute.

The first canon [1] of statutory construction is, of course, that where the language of a

---

1. To refer to this rule as a "canon" is something of an understatement; it is in fact the large-bore howitzer of statutory construction. *See Connecti-*

statute is clear in its application, the court must apply its plain meaning as written. *See Connecticut Nat. Bank,* —— U.S. at ——, 112 S.Ct. at 1149 ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: 'judicial inquiry is complete.' ") (citations omitted); *Oberg v. Allied Van Lines,* 11 F.3d 374 (7th Cir.1993); *see also Public Citizen v. Dept. of Justice,* 491 U.S. 440, 470, 109 S.Ct. 2558, 2574–75, 105 L.Ed.2d 377 (1988) (Kennedy, J., concurring) ("Where the language of a statute is clear in its application, the normal rule is that we are bound by it."); *Family & Children's Center v. School City of Mishawaka,* 13 F.3d 1052, 1060 (7th Cir.1994) ("If the statute is unambiguous, we must enforce the plain meaning of the language enacted by Congress."). Like all general rules, there are secondary canons that may on rare occasions modify the first. The court believes to have found one that is applicable here. *See* Opinion of the Court, *ante* p. 406 (claiming that the text of § 101(5)(B) is ambiguous).

In its opinion the court concludes that since the statute's text is ambiguous, it is permitted to examine the legislature's chronicles with the hope of finding an insight that might help reach the right result. This approach concerns me. According to the majority opinion, since the Supreme Court noted in *Kovacs* that certain terms ("equitable remedy," "breach of performance," and "right to payment") were not defined in § 101(5)(B), the provision as a whole must be ambiguous as well.[2] 469 U.S. 274, 279, 105 S.Ct. 705, 707–08, 83 L.Ed.2d 649 (1985). This is a logical leap I cannot make. Any ambiguity the Supreme Court may have noticed in *Kovacs* related solely to the meanings of these terms, which were central to the disposition of that case. *Id.* Our appli-

cation of § 101(5)(B) in this case, by contrast, does not turn on the meanings of these terms. They are simply not the subject of the parties' dispute. Carpetland and Udell merely contest whether Congress, in the second line of § 101(5)(B), forgot to insert the term "alternative" immediately before the word "right" on the same line. *See* Opinion of the Court, *ante* p. 406, and *infra* note 5 and accompanying text. Since our decision today does not turn on resolving any vagueness, the court's affirmation of the statute's presumed ambiguity, allowing it to delve into the legislative history, does not, in my opinion, comport with appropriate statutory construction.

I would take a different tack. Rather than appearing not to do what we must, let us grant that this statute needs fixing, and that under some exceedingly limited circumstances, we are actually permitted, within the law, to do what is normally the exclusive domain of Congress, that is, mend an otherwise implausible statute. Despite the primacy of the plain language canon,[3] there is a legitimate, albeit very narrow, exception to our duty to follow the unambiguous text of a statute—where the plain language of the statute would lead to "patently absurd consequences," then we need not so apply the language. *See Public Citizens v. Dept. of Justice,* 491 U.S. 440, 470, 109 S.Ct. 2558, 2574, 105 L.Ed.2d 377 (1988) (Kennedy, J., concurring in judgment), citing *United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 380–81, 92 L.Ed. 442 (1948); *see also Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892); *FBI v. Abramson,* 456 U.S. 615, 640, 102 S.Ct. 2054, 2069, 72 L.Ed.2d 376 (1982) (O'Connor, J., dissenting). As Justice Kennedy wrote, "[w]hen used in a proper manner, this narrow exception to our normal rule of statutory construction does not intrude upon the lawmaking powers of Congress, but rather demonstrates a respect for the co-

---

*cut Nat. Bank v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992).

**2.** There is no presumption that words in a statute need a definition if they have a plain meaning. In fact the presumption is just the opposite. *See Connecticut Nat. Bank,* —— U.S. at ——, 112 S.Ct. at 1149. Congress need only give a special

definition to words when it wishes to assign an uncommon or peculiar meaning to them. *Corning v. Brennan,* 417 U.S. 188, 201, 94 S.Ct. 2223, 2231, 41 L.Ed.2d 1 (1974).

**3.** *See supra* note 1 and accompanying text.

equal Legislative Branch, which we assume would not act in an absurd way." *Public Citizens,* 491 U.S. at 470, 109 S.Ct. at 2574. This rare exception to the normal rule remains a legitimate tool for the judiciary, so long as we act with self-discipline, invoking it only in those few situations where the result of applying the plain language genuinely would be absurd, and where the alleged absurdity is obvious. *Id.* To prevent eager judges from reconstructing every disliked statute, the Supreme Court has taught that the patent-absurdity exception is reserved for only the truly inane results of a literal construction, such as using federal mail laws to prosecute a sheriff for obstructing the mail, even though the sheriff was executing a murder arrest warrant on the mail carrier, or worse, using a medieval law to punish a doctor for drawing blood in the public streets, even though the doctor was aiding an accident victim. *See Public Citizens,* 491 U.S. at 471, 109 S.Ct. at 2575, citing *Holy Trinity,* 143 U.S. at 460–61, 12 S.Ct. at 512–13. These are the archetypes that our circumstances must match if we are to supplement the unambiguous text of a statute and still remain faithful to the law.

To appreciate the patent absurdity of implementing the plain text of Section 101(5)(B) one must keep in mind that this is a bankruptcy statute. If, following the plain language, an injunction may be stayed in bankruptcy anytime the underlying breach of contract[4] or law also happens to give rise to money damages, the real-world results would be ludicrous. If we were to apply the plain text of § 101(5)(B) to individuals restrained by court orders—e.g. trespassers, polluters, stalkers, batterers—theoretically, simply by filing bankruptcy, the violator could escape from any restraining order prompted by a breach that also gave rise to an award of money damages. Certainly the parade of

horribles is extensive, and I need not belabor it further. Since the text of § 101(5)(B) presents one of those extremely unique circumstances of patent absurdity, we may turn to the purpose, context and policy of § 101(5)(B) to supplement its plain language.[5]

Having so concluded, I am, however, mindful of the risk this exception creates to the rule of law. As Justice Kennedy admonished, "loose invocation of the 'absurd result' cannon of statutory construction creates too great a risk that the court is exercising its own 'WILL instead of JUDGMENT,' with the consequence of 'substitut[ing] [its own] pleasure to that of the legislative body.' " 491 U.S. at 471, 109 S.Ct. at 2575, citing The Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton). We must therefore use it most sparingly.

---

4. Section 101(5)(B) not only refers to contract based rights, but can reach rights to performance arising from public law breaches. *Kovacs,* 469 U.S. at 279, 105 S.Ct. at 707–08. In contracts, so applying the plain language of § 101(5)(B) would result in the policy debacle of discouraging parties from drafting any liquidated damages clauses to accompany their equitable remedies. While creating crazy incentives, I believe that this result alone would fall short of the kind of

obvious inanity necessary for the patent-absurdity exception to apply.

5. I accept the conclusion in the opinion of the court, that adding the word "alternative" immediately before "right" on the second line of § 101(5)(B) *is necessary for this statute to work* in the real world. *See ante* Opinion of the Court, p. 408.